## GEORGE LIEBY v. THE HEIRS OF LUDLOW AND C. PARK.

Where any matter is properly triable at law, and has been there tried and decided, equity can not interfere, to correct the decision, where no fraud has been practiced by the successful party, and where no accident prevented a full and fair trial.

The power of administrators to sell the real estate of their intestate for the payment of debts, is strictly a legal power. If a sale be made, the question is triable at law; and when, at law, it has been decided that no authority existed, equity can not set it up.

If a person advance money to pay the intestate's debts, no lien is thereby acquired upon the lands of the intestate, in the hands of the heir.

An agreement to indemnify a warrantor against his covenant of warranty, can not injuriously affect the warrantee, or give him ground of complaint against the parties to such agreement.

THIS was a bill in chancery, to which the defendants demurred generally. It was certified here, for decision, from the county of Hamilton.

The bill charged that the complainant purchased from Culbertson Parks three different but contiguous pieces of ground, now situate within the limits of the city of Cincinnati. The first in 1812, the second in 1813, and the third in 1818, for which he paid a full and fair consideration, and received regular conveyances, with covenants of warranty; that he entered into possession of the same at the time of purchase; had made valuable improvements, and had ever since continued in possession; and that at the time of the several purchases, he had no notice of any claim, or pretended claim, of any person whatever.

The bill further stated, that on December 10, 1810, the said Parks had purchased the tract of land, of which complainant's purchases were part, at a public sale, for a full and fair value, from

the administrators of Israel Ludlow, deceased, under orders of the court of probate, a court of competent jurisdiction, which orders, at the time of purchase, were in full force and unimpeachable.

It further charged, that in the month of May, 1804, when the first order was made for the sale of the real estate of Israel 470] *Ludlow, on the application of his administrators, the tract of land purchased by Parks was without the limits of the city of Cincinnati, and wholly unimproved; that Ludlow, at the time of his death, in January, 1804, was largely insolvent; that the outstanding debts greatly exceeded the amount of personal assets and of the then value of the real estate; that the administrators, in consequence of the order for selling the real estate, made terms for delay with the creditors, by reason of which the estate was extensively benefited, and a considerable property divided among the children and heirs of Israel Ludlow, the defendants in the case.

The bill further charged, that the heirs of Ludlow had prosecuted an ejectment against Parks, for a tract of twenty-seven acres, of which the complainant's grounds were part, upon which they had recovered a judgment in the Supreme Court of the state, and threatened to take out a writ of possession, and dispossess the complainant.

The bill further charged, that subsequent to the recovery in ejectment, J. D. Garrard, one of the defendants, had entered into a covenant with C. Parks to indemnify him upon all his covenants of warranty, for sales of parts of said twenty-seven acres, by way of compromise of the dispute, which compromise operated as a fraud upon Parks' covenant to complainant.

The bill also alleged, that the plat of the city, used at the trial of the ejectment, to prove that the twenty-seven acre tract in dispute was, in May, 1804, within the limits of the city, was entirely erroneous; and that a true copy, made part of the bill, shows that said ground, at the time stated, was not within the limits of Cincinnati, as it then existed.

All the documents referred to were made exhibits; and the prayer was for a perpetual injunction, for a release of the title, and for any benefit complainant might claim of the covenant with Parks.

The order of the probate court of May, 1804, referred to in the bill, is in these words:

Lieby *v*. Parks and others.

"Administrators of Israel Ludlow, deceased, exhibit an account current of said estate. John Ludlow and James Findlay sworn, and pray order to sell the real estate, to satisfy the debts, etc. Court grant the prayer of the administrators *excepting and re-*  [471 *serving the farm and improved lands at Cincinnati, with the houses and lots in Cincinnati.*"

The order of December, 1810, also referred to, is in these words: "*December* 17, 1810. *Petition of the administrators of Israel Ludlow, deceased, etc., for to sell real estate to satisfy the demands, etc., which this court grant.*"

The covenant between Garrard and Parks referred to is in these words:

"Memorandum of an agreement made and entered into this twenty-sixth day of January, in the year of our Lord one thousand eight hundred and thirty, between Culbertson Parks, of the city of Cincinnati and State of Ohio, of the first part, and Jepthah D. Garrard, of the same place, witnesseth: That the said Culbertson Parks, for and in consideration of the covenant of the said Jepthah D. Garrard, hereinafter mentioned, covenants and agrees to and with the said Jepthah D. Garrard, his heirs, executors, or administrators, that he will make and execute to the said Jepthah D. Garrard, his heirs and assigns, on demand, a deed of release or quitclaim to the following described property in the city of Cincinnati, to wit: A certain part of lot number one hundred and four, in Cincinnati, as the same is now occupied by Robert Kennedy and William Conclin, measuring about thirty-eight feet on Main street, and running back to the alley about one hundred and ninety feet. Also, a certain other lot, bounded as follows: North by Third street, as extended; east by a lot occupied by George Lieby; south by Second or Columbia street, extended; and west by the section line of the seventeenth fractional section, on which the city is in part laid out. Also, a certain other lot, bounded as follows, to wit: North by Fifth street; east by the division line between the said Parks and a lot of twenty-seven acres, late the property of Ormsby and Stanley; south by Third street, extended; and west by the east line of a lot heretofore sold to Messrs. Phillips, Tatem, and Speer, excepting therefrom so much of said lot as was heretofore deeded to Caleb Fagely. And the said Culbertson Parks covenants and agrees to and with the said Jepthah D. Garrard to deliver up to the said Garrard the

quiet and undisturbed possession of the said premises, above men-
tioned, whenever the same shall be demanded.  *And the
said Jepthah D. Garrard, on his part, covenants and agrees to and
with the said Culbertson Parks, his heirs, executors, or adminis-
trators, that he will indemnify and save harmless the said Cul-
bertson Parks, his heirs, executors, or administrators, on all of his,
the said Parks', covenants contained in certain deeds, heretofore
made to George Lieby and others, for parts of a twenty-seven acre
lot, which lie between Third street and the Ohio river; which said
parts of the said lots have been recovered from the said Lieby and
others, in an action of ejectment, by the heirs of Israel Ludlow,
deceased, in the Supreme Court of the State of Ohio.  And the
said Garrard further covenants and agrees to and with the said
Culbertson Parks, his heirs, executors, or administrators, that he
will pay all the costs that may have accrued on the suits for the
said twenty-seven acre lot, and the said lot on Main street, in the
Circuit Court of the United States, and in the court of common.
pleas and Supreme Court of Hamilton county and State of Ohio,
as the same shall be taxed by the clerks of the said courts.  And
the said Garrard further covenants and agrees to and with the
said Culbertson Parks that he will pay the fees that may now be
due and owing by the said Culbertson Parks to his counsel,
Messrs. Benham, Este, Wright, Caswell, and Starr, provided they
do not exceed five hundred dollars in all; and if they exceed, in
the aggregate, the sum of five hundred dollars, the said Parks is
to pay the excess.  And the said Garrard further covenants and
agrees to pay to the said Parks the sum of one thousand five hun-
dred dollars upon the delivery of the deeds of release, and the
quiet and undisturbed possession of the premises, by the said
Parks to the said Garrard.  And the said Garrard further cov-
enants and agrees to and with the said Culbertson Parks, his
heirs, executors, or administrators, that he will indemnify and
save harmless the said Culbertson Parks, his heirs or assigns,
against any and every claim which the heirs at law of Israel Lud-
low, deceased, may have against the following tract or parcel of
land, now in the possession of the said Parks, to wit: Beginning
at the intersection of Fifth and Mill streets, thence eastwardly
with Fifth street to the west line of a lot deeded by the said
Parks to Phillips, Tatem, and Speer; thence south with their line
to Third street, extended ; *thence with Third street to

the east line of Mill street; thence with Mill street to the be·ginning.

" In testimony whereof, the said parties have hereunto set their hands and seals, the day and year first above written.

"C. PARKS,    [Seal.]
JEPTHAH D. GARRARD.    [Seal.]

" Witness: DANIEL GANO."

"·It is the agreement that this article is in no manner to affect the recourse of the said Parks upon his deed from the administrators, for the said lots.                               J. D. GARRARD."

Recorded February 22, 1830.

Cincinnati, June 17, 1831 : " A true copy from record No. 31, page 407."

HAMMOND, in support of demurrer :

This is a bill in chancery, the object of which is to set up in equity, the title claimed under the sales made by the administrators of Ludlow.    It is the same case decided by this court, in ejectment between the heirs of Ludlow and Culbertson Parks.    4 Ohio, 5.

The bill, so far as I can comprehend it, assumes three distinct grounds for equitable relief :

1. That the sale was valid at law, but that all the facts were not fully before the court at the trial.

2. That the sale was good in equity, and ought to be aided there,. though inoperative at law.

3. That the subsequent arrangement between the defendants, Garrard and Parks, furnishes a separate, substantial ground of equity.

Upon the first point, it is necessary to say but little.    The question presented was triable, and was fully tried at law.    It is well settled, in this court, that it can not be reheard in equity, without showing that a full and fair trial could not have been had at. law, either from the conduct of the opposite party, or by reason of some peculiar feature of the case.    2 Ohio, 21,–24 ; 4 Ohio, 19, 268, 278.    These cases are conclusive upon this point, and are in accordance with the well-established principles of proceeding in courts of equity.

*The second position of the bill seems to be that of ask- [474 ing the aid of the court to sustain the defective execution of a.

power. The facts alleged in the bill, in any way material to the decision, are the same that were introduced, considered, and decided upon, by the court at law. It is well settled that a court of equity will aid the defective execution of a power, existing in full force, if the transactions were all conducted in good faith. But it can never aid any act, in the nature of extending a power, by setting up the power itself. 2 Ohio, 393.

In the suit at law, the court decided, that the order of 1804 did not confer authority or power to sell the ground in question. The power is the same at law and in equity. If it does not exist at law, it does not exist, and can not be set up in equity. They also decided, that the order of 1810 conferred no power or authority to make the sale. 4 Ohio, 38, 39.

In Tiernan v. Beame, 2 Ohio, 392–394, this court decided, that a general order, directing administrators to make deeds upon the contracts of their intestate, was null and void, because unauthorized by the law. An attempt was made to aid the proceeding in a court of equity, but the court refused to interfere, alleging that it would be as regular and proper to apply to the court to grant such an order under the law, as to undertake to set up a power where none existed, but where the parties acted under a mistake, supposing the general order a valid power.

The same doctrine is held in Wells v. Cowper and Parker, 2 Ohio, 129, and in Ludlow's Heirs v. C. & J. Johnston, 3 Ohio, 575. The two first of these cases were in equity, and the relief sought was refused.

The facts charged in the bill, upon which the third ground of relief appears to be predicated, are these: In January, 1830, Garrard, in behalf of the heirs, and Parks made a compromise, by which Garrard agreed to give up to Parks a great part of the ground in dispute; to pay him a sum of money, and to indemnify him on his warranty; or, in other words, to pay the amount that the vendees of Parks might recover of him. This compromise is charged in the bill to be a fraud upon the covenants of warranty from Parks. As at *present advised, I am unable to see how this position is to be made out. The complainant's action against Parks, should he be dispossessed by the heirs of Ludlow, could not be affected by this compromise. His remedies are left untouched by it. Lieby is no party to the compromise, and none of his rights are touched by it. The judgment was in full

force, and its effect is neither lessened nor increased by the compromise. So far as I can see, the compromise gives him advantages. In the first place, it leaves Parks in possession of property to pay any damages which the complainant might recover. But for this compromise, he would have been thrown penniless upon the world. And in the next place it would secure to the complainant the additional responsibility of Garrard to pay these damages. For, as the covenant with Parks is made with the view to the claims of his vendees, I think it possible that a court of equity might interfere, if necessary to secure them the benefit of it. But, until I am apprised of the grounds upon which the complainant's counsel rests this part of the case, I am too much in the dark to discuss it. From all the light before me, I think the demurrer ought to be sustained.

GAINES, contra:

The object of the bill, filed in this cause, was to enjoin the heirs of Ludlow from dispossessing the plaintiff of eight acres of land, in Cincinnati, purchased by him from Culbertson Parks, who had conveyed to him the same, at various periods, by deeds of general warranty, the first of which was executed in 1812, and the last in 1818. Parks had purchased twenty-seven and six-tenths acres with other land adjoining, at a sale made by the administrators of Israel Ludlow, on December 13, 1810. The administrators, who were Mrs. Ludlow, the mother of said heirs, John Ludlow, their uncle, and General James Findlay, the friend of their father and mother (together with Sineas Pearson, who died in a short time after his appointment as administrator), were qualified on February 2, 1804. Said Israel Ludlow died on January 21, 1804, *insolvent*, but leaving a considerable amount of property, both real and personal.

*At May term, 1804, of the common pleas or probate [476 court of Hamilton county, the said administrators, after ascertaining that the personal estate of said intestate was sufficient to pay only a very small portion of his debts, applied to the said court for an order to sell the real estate. The application was granted, and an order made that the administrators should sell the lands belonging to said estate, excepting, however, the farm and improved lands near Cincinnati, and the house and lots in said town.

The administrators, however, did not sell the lands embraced in this order, and ultimately purchased by said Parks, as above stated, until they had procured from said court a second order, which was made on December 17, 1810, four days after the sale had taken place. The territorial law of 1795 was in force at the death of said Ludlow, and remained in force until June 1, 1805, when the repealing act of February preceding took effect. In this latter act, nothing was said upon the subject of authorizing administrators to sell the lands belonging to the estates of their intestates. An act was, however, passed in 1808, giving such power, and was in full force when the sale was actually made.

The sale was to the highest bidder, fairly conducted, and the land in question brought, if anything, more than its then value. The purchase money was paid by Parks, and applied by the administrators to the payment of said Ludlow's debts; a conveyance made to Parks, who went into the actual possession, and subsequently sold the eight acres to the plaintiff, as above stated.

The amount paid by the plaintiff, as a consideration for the part then purchased by him, was sixteen hundred dollars, upon the reception of which, said Parks made him conveyances, with general warranty. The plaintiff went into the actual possession, made valuable improvements on said eight acres, and has remained in possession ever since. The bill alleges that the plaintiff had no *notice*, actual or constructive, of any claim or pretended claim of the said heirs, until the institution of their action of ejectment, some few years since, against said Parks, to recover said twenty-seven and six-tenths acres, in which suit, himself and others were 477] also made defendants. *It also averred that the said court of common pleas, or probate court, was, at the date of both of said orders, a court of *competent jurisdiction;* and that said orders had never been set aside or reversed by writ of error or appeal, but yet remain in full force. It is also stated that the primary object of the administrators was, if possible, to save a surplus of said insolvent estate for said heirs; and to accomplish this object the term of administration was extended to the unusual period of fifteen or sixteen years, so that the lands of said estate (being mostly in Cincinnati or its immediate vicinity), might have time to rise in value; that the creditors were pressing with their respective demands, some of which were founded upon sales of *lands* to said Ludlow, but which he had failed to pay for in his lifetime; and,

that among the claimants, were some who had instituted suits and obtained judgments. And, finally, that by pursuing the above course, and by obtaining indulgence from the creditors by the ad·vances by said Findlay ( one of the administrators ), of his own money, the said heirs, so far from being *injured*, were *benefited* to the amount of eight or ten thousand each, which was ultimately saved for them from the wreck of said insolvent estate. The bill also charges that the said heirs exhibited a spurious map or plat of said city, at the trial of their action of ejectment, in which plat, the western boundary of said city was colored at the "section line," which included within the said city the said twenty-seven and six-tenth acres, when the boundary, really at "*Western Row*," would exclude it, and bring it within the first-mentioned order of court, which was confined to unimproved lands out of said city. It was also stated that after the trial of the ejectment suit, in which said heirs succeeded, Jepthah D. Garrard, who had intermarried with one of them, entered into a compromise with said Parks, and stipulated to indemnify him against the covenants of warranty to the plaintiff, which act was charged as a fraud upon the said covenants. The prayer of the bill was for special relief, by perpetuating the injunction, and giving the plaintiff the benefit of the said compromise, which might result from the indemnity from said Garrard to Parks, and for general relief.

*The heirs of Ludlow filed a general demurrer to the bill. [478

The demurrer of the defendants takes the bill upon its face and denies the plaintiff's claim to relief. It therefore admits as true all of the allegations of *fraud* in exhibiting the spurious plat of the town, and thereby obtaining the advantage at the trial of the ejectment suit; it also admits the competency of the probate court to make the orders of May, 1804, and of December, 1810, and that those orders are yet in full force and unreversed; that the estate of their ancestor was *insolvent* at the time of his death; that the administrators acted fairly and honestly throughout the whole course of their administration, and with a view of promoting the interest of said heirs, and that the latter were *benefited* and not injured by the course pursued; that the said Parks was the highest bidder at said sale, paid the purchase money, and received a deed from said administrators; that his conduct was fair and honest; that the plaintiff was, at the time of *his* purchase and receiving the several conveyances from said Parks, as well as at the time of

paying the purchase money to said Parks, entirely ignorant of any claim, or pretended claim, of said heirs to the land in controversy; and finally, that he, the said plaintiff, was a *bona fide* purchaser without notice. These, and the various other allegations of the plaintiff, are admitted by the demurrer.

The plaintiff relies upon the following grounds in opposition to the demurrer, and in support of the bill:

*First.* That the orders of the probate court of Hamilton county, at May term, 1804, and December term, 1810, being the orders of a court of *competent jurisdiction,* can not be *collaterally impeached;* but if those orders, or the proceedings of the administrators under them, were, in anywise, irregular or defective, the corrective should have been a writ of error, or some other proceeding pointed out by law, for the correction of erroneous acts of judiciary tribunals.

*Second.* That the plaintiff, having purchased said lots of land, paid the purchase money and received conveyances, when entirely ignorant of any claim of said heirs afterward set up by them; and finally, that at the time of said purchase, payment, and conveyance, the said orders being in full force, he should be protected as the *bona fide* purchaser without *notice.*

479]   \**Third.* That the heirs of Ludlow being *benefited* and not *injured* by the sales, since complained of, have no right to disturb the purchasers, who acquired their lands at those sales.

*Fourth.* That the law of 1795 being in force when the said Ludlow died, and when the trust of the said administrators was undertaken, should be considered as the only law which was applicable to the estate in question, and that, therefore, the subsequent repeal of that law, in 1805, could not affect an administration commenced under it, but unfinished at the time of its repeal.

*Fifth.* That a court of equity will not countenance the making of a contract, such as that between Parks and Garrard, to the prejudice of the rights of the plaintiff, who held the covenants of the former, stipulating to warrant and defend the title to the land in controversy, and that Garrard, by voluntary assuming the liability for Parks' covenants of warranty, is bound in *equity* to do, under the responsibility thus assumed, all that Parks was bound by his said covenants to have performed, in the absence of any compromise whatever.

Upon the first point it is unnecessary to say anything more,

than that the *credit* universally recognized, as being due to the orders, judgments, and decrees of a court of competent jurisdiction, until set aside by the same court, or reversed by an appellate court, is now *for the first time* questioned by the defendants' counsel. The demurrer admits that the court of probate, at the respective dates of the orders in question, was one of competent jurisdiction, and that those orders have never been set aside or reversed by any *direct* proceeding.

But were this fact denied, I reply that article 3 and section 5 of the constitution of Ohio will settle the question as to the general probate powers of the said court, held independently of legislative enactments, and the territorial law of 1795, which was in force at May term of the court, in 1804, when the first order of sale was made, and the act of 1808 was in force at December term, 1810, when the latter order was made, unless it be conceded (as I contend) that the law of 1795, as to administrations, *commenced under it, and not finished until said term in [480 December, 1810, was in force at the last-mentioned period. Both of those laws authorized the said court to order the sale of real estates of intestates, upon the representation of the administrators to the court, and the fact appearing to the satisfaction of the judges, that the *personal estate* was insufficient to pay the debts, etc.

Upon this point turned the *jurisdiction* of the said court to make the orders in question; and the forms prescribed as to the manner of making the sales, etc., were merely directory to the court and the administrators; but the non-observance of those forms did not render the sale *void*, because the legislature, in making the law, did not so declare it. Thompson *v.* Tolmie, 2 Peters, 157, and cases cited; 7 Johns. 485. "It is not in the power of either the judiciary or legislature to render nugatory an existing judgment of a court of competent jurisdiction." 2 Bin. 41; 3 Bin. 54; 2 P. Wms. 491; 2 Bro. Ch. Cas. 400; 5 Ves. Jr. 423; 1 Cowen, 622, 711; 9 Mass. 124; 11 Mass. 227; 2 Bibb, 401, 518; 3 Bibb, 216; 10 Serg. & Rawle, 262; 2 Mon. 140; 3 Ohio, 305.

Upon the second point, see 3 Ohio, 332. "A party having title to land, under a decree in chancery, conveys in good faith *before citation in error is served*, the purchase's title is not affected by a reversal of the decree."

The order or decree under which Parks purchased has never been set aside; and therefore the equity in favor of the plaintiff,

who purchased from Parks, while there was an unreversed order of sale, or which is the same thing, an unreversed decree on record, is much stronger than the case above cited. Indeed, the doctrine of protecting the *bona fide* purchaser is so well settled that it would be a waste of time to quote authorities in its support. See, however, Contherland *v.* Brush, 7 Johns. Ch.; 2 Johns. Ch. 190.

Upon the third point it may, with truth, be observed that neither the constitution nor laws of the United States, nor of any state in the Union, contemplate redress for *benefits* received, when unaccompanied with any *injury* whatever. You may in vain search the books of precedent, both legal and equitable, for a dec-481] laration or a bill, the complaint of *which is predicated on an act highly *beneficial* to the party complaining. Big. Dig. 248, sec. 1; 11 Mass. 379.

Upon the fourth point. The law of 1795, being in force when Ludlow died, remained, as to *his* estate, until the administration commenced under it was finished. All laws are prospective in their operation; and it therefore follows, that a law passed subsequent to the death of an individual, prescribing duties to administrators, etc., could not be construed to have been intended for the direction of those who had been already proceeding under a former law. If such a construction were to prevail, great inconvenience, as well as incalculable injustice, might be the consequence; and it will not be an answer, to say that the administrators alone are concerned. Suppose that the repeal of a law takes effect just before a sale, commenced under that law, has been completed, and a very different mode of proceeding is pointed out as a substitute; or suppose the mode of foreclosing a mortgage by *scire facias* should be repealed without a saving clause, just after a suit by *scire facias* has been commenced under the law in force at the time, would the repeal affect the suit thus commenced, in the latter case, or the sale in the former?

Upon the fifth point. I appeal to the understanding of any man who knows the nature and obligation of a general warranty deed, and ask him, if A. for instance holds the deed of that character, executed to him by B., in consideration of ten thousand dollars, and C. covenants to indemnify the latter against his covenants to the former, can C. immediately turn A. out of possession, by vir-

Lieby *v.* Parks and others.

tue of a judgment against B., for land, including the land of A., which is the subject of indemnity?

In conclusion, it may be observed that the matters relied on in support of the bill are of such a character as to have been inapplicable, or at least of very doubtful application, in support of the general issue, in the action of ejectment. The plaintiff's title depended, in that action, upon that of Parks, the accidental wrong recital on the face of which latter excluded it from the jury. The fact of the plaintiff being a *bona fide* purchaser, without notice, as well as the other facts *here relied on, could not have [482 availed under the consent rule which bound him to insist on the legal title only.

The plaintiff's remedy was, therefore, in equity alone, where he could avail himself of all matters material in defense of his title.

GARRARD, in reply:

In our opening argument, we gave (as far as could be gleaned from the bill) what we supposed were the propositions intended to be relied upon, to support the complainant's claims to relief. We now have the argument of the complainant's counsel before us, which leaves us where we commenced, with full liberty to guess at his object. No distinct, definite ground for equitable relief is set forth in the bill. The bill is a novel jumble of facts, argument, and assertion. The argument now furnished as a commentary upon the bill, is its parallel in contradictory assertions and positions. All the orders of the court of common pleas, which are referred to in the bill, and which are attempted to be set up in chancery to sustain the title of the complainant, are predicated upon the fact that the estate of Ludlow was solvent, but that there was a deficiency of *personal estate only.* Upon no other *predicate* could those orders ever have been applied for or granted. The laws of 1795 and 1810 did not contemplate the granting of such orders in cases of *insolvency.* There were other statutes regulating cases of insolvency, which required a different course of proceeding. Now it seems to us, that if these orders are set up and sustained as the foundation of the title of the complainant, they must be left to stand upon the reasons and state of fact upon which they were made by the court of common pleas; and that the *insolvency of the estate*, as set forth in the bill, is wholly inconsistent with and repugnant to the real foundation of the title, as derived

Lieby *v.* Parks and others.

from the administrators. The view, however, which we take of the case, does not require an exposition of the inconsistency of the various grounds which the bill and argument assume.

We shall call the attention of the court to the three propositions, which we supposed to present the whole matter of the bill.

**483]** *\*First.* That the sale was valid at law, but that all the facts were not fully before the court at the trial. The trial at law is fully reported in this volume of the Reports, page 5, and there it will be seen that the whole case was fully presented and decided. The bill contains a general charge that the trial was unfair, and that the defendant was precluded from making his defense; but no facts are charged in the bill, or insisted on in argument to show how the trial was unfair. It is not pretended that they were taken by surprise in any one single legal proposition, upon which the heirs predicated their right to a recovery. The whole grounds of their claim had been discussed time after time, and were fully known to both parties. In making out the charge of an unfair trial at law, the counsel ask if the heirs did not object to the whole of Parks' evidence, and exhibit a spurious town plat to show that the order of 1804 did not cover the ground in dispute?

We answer, unhesitatingly, that the deed of Parks, together with the orders of 1804 and 1810, were objected to by the plaintiff's counsel as illegal evidence of title, and their objection was sustained by the court. But what does this prove? That the trial was unfair and fraudulent? That the court were in an error? That the defendant was taken by surprise? Admitting all that is charged *in the way of argument,* we can not see how the party can be relieved in equity upon the ground of an unfair trial at law, when no fact is disclosed from which the charge can be inferred.

It is said that a spurious town plat was given in evidence; but with what truth the assertion is made, the report will show. The subject matter of this charge was made the ground of a motion for a new trial with others, and the opinion of the court, by Judge Hitchcock, will demonstrate its validity, admitting it to have been true. It will be seen, by a reference to that opinion, that throwing the plat, and all the matters connected with it, out of the question, the verdict was sustainable upon other and sufficient testimony, which was not even questioned upon the trial of the cause on the circuit.

In the further support of this ground of relief, it is asked if the

insolvency of Ludlow, the fairness of the sales, and *the [484 benefit received by the heirs could be given in evidence in the action of ejectment, and because they could not, it is argued that the trial was unfair and fraudulent.   It is certainly true, and this court required no reference to authorities to convince them that such matters could not be given in evidence; but it certainly was not the result of any fraud or unfairness on the part of the heirs of Ludlow at the trial.   The rejection of such evidence should rather be attributed to the sound judgment of the court, upon the rules of evidence, which are too stubborn to accommodate themselves to every man's grievances.

If, in truth, the complainant has real meritorious grounds for equitable relief, which could not have availed him at law, the court will interfere in his behalf; but it seems to us that this ground may, and does often exist, where there is neither fraud nor collusion in the trial at law.   They are distinct grounds for equitable interference, and the existence of the one does not imply the presence of the other.   Whether the matter stated in the argument be such as would justify the interference of a court of equity will be considered under the second proposition.

We maintain that the trial at law was a fair and full trial of the whole cause; that nothing calculated to elucidate the origin, nature, and validity of the complainant's title, was withheld or excluded by the act of the heirs of Ludlow, and we appeal to the report of the case to sustain us upon this ground.   There is no fact disclosed either in the bill or argument that looks like fraud or unfairness in the trial.   The general charge is fraud and unfairness, and the proof supplied, in the way of argument, is that the counsel for the heirs objected to illegal evidence going to the jury, and the court sustained them; that, by the rules of evidence, the defendant was precluded from using incompetent testimony, and thus defrauded out of a fair trial.

*Second.* The second proposition is that the sale was good in equity, and ought to be aided there, although inoperative at law.

Upon what ground will a court of chancery interfere to aid the title in this case, which has been pronounced invalid at law?   A court of equity can interfere upon one of two principles only.

*First.* To aid the defective execution of a valid power, re- [485 sulting from accident, mistake, or fraud.

*Second.* Or to create and set up a power where none existed,

because the administrators might have clothed themselves with authority.

The right and duty of courts of equity to interfere in cases where a valid power has failed in the execution, through fraud, accident, or mistake, is readily admitted by us; and all the cases to which the court have been referred by the complainant's counsel are of this character. The judgment at law, now sought to be enjoined, was not obtained because of a defective execution of a valid power, resulting either from fraud, mistake, or accident.

The recovery in ejectment was had solely upon the ground that the administrators acted without authority. That they had not clothed themselves with authority to sell the land in dispute. The title was in the heirs at law, and could be divested only in the mode pointed out by the statute. The question, therefore, was, have they been divested? That question has been settled in the negative, without involving, in its determination, the doctrine of courts of equity concerning the defective execution of powers. The case was presented, and turned upon the question of the existence of a power or authority in the administrators to make the sale. No authority could be found or produced. The order of 1810 was after the sale, and that of 1804 excluded the premises in dispute from its operation. The deed stood, then, without any foundation to support it. It was held to be null and void, and the plaintiffs entitled to recover.

If a court of chancery can aid in this case, upon the equitable principle of assisting and supplying defects in the execution of a valid power, let us see what is the defect, and in what did it originate. The orders must be kept in view, and the inquiry directed to matters arising subsequent to their creation by the court of common pleas. What has intervened in their execution which this court can correct? Has there been a mistake in the description of land sold and deeded, so that the deed does not embrace it? If so, the court can grant relief. Had the land been sold under a proper authority, and the administrators died before the 486] money *had been all paid, and the deed executed, a court of chancery would decree a conveyance, and thus perfect that which had been prevented by accident. Had the administrators sold one tract, and received a full consideration, and fraudulently induced the purchaser to accept a deed for a different and less valuable one, a court of chancery would have granted relief. And

444

so throughout the whole class of cases, where the proper and fair execution of a power has failed through mistake, accident, or fraud.

No mistake has arisen since the granting of either of these orders, that can be laid hold of to sustain this bill. No accident has happened to defeat the execution of the orders. No fraud is imputable to the defendants in this bill, by which the complainant has lost any of his rights, or his interest is prejudiced.

The whole difficulty is antecedent to the sale and the date of the contract. The mistake consisted in the administrators supposing that they had authority to sell, when, in fact, they had none. This is a mistake which a court of chancery can not relieve against. The case of the complainant is not an uncommon one. He has gone into the market and purchased of parties, not professing to sell their own title, but the estate of others, for whom they were acting, under special and peculiar circumstances. He failed to inquire into the validity of their authority, and has paid his money upon a mistaken consideration. It turns out that those of whom he purchased had no right to sell. He now applies to a court of chancery to declare that a valid power which the law did not recognize, and which has been decided to be invalid. Under the pretense of aiding the defective execution of a power, the attempt is made to create a power, for the want of which his title failed to protect him in the suit at law. No case can be found, we apprehend, that sanctions such a doctrine; at least, we have not been able to lay our hands upon it. None such has been referred to by the counsel for the complainant.

The doctrine of courts of chancery interfering to aid the defective execution of powers has frequently been before this court; and it seems to have been distinctly apprehended in several of the reported cases. In Tiernan v. Beame, 2 *Ohio, 393, the court [487 lay down the rule in its fair and proper extent. They say: "Chancery may aid a deed rendered inoperative by *accident* or *mistake*, when the GRANTOR had power or authority to convey, and intended to do so; but it can not generally supply the want of authority. It can not give effect to deeds executed by persons who have neither title nor authority to convey from those who have the title. The deed, from the executors of Newman to Beame, was *unauthorized and illegal*. Its operation was not prevented by a defect in the form, or in the execution of it, but by a *total want of power to convey, which no court of equity can supply*. A decree may remedy a

445

Lieby *v.* Parks and others.

mistake in a conveyance by a person having power to convey, but it can not *create a power.* The statute has pointed out the only method by which executors or administrators can obtain power to sell real estate, or to execute contracts for the sale of it, made by their testators or intestates. It is necessary to pursue that course, in order to obtain the power; and an attempt to convey before they have done so, must be wholly inoperative."

The case of Nowler, Douglass, and others *v.* D. L. Coit, 1 Ohio, 522, is, perhaps, as strong a case as could be presented to a court of chancery, to induce them to act upon the principle insisted on in this case, by the counsel of the complainant. That was the case of a sale without authority, by administrators. The heir at law, instead of proceeding by an ejectment as he might have done, to recover the possession, filed a bill in chancery, calling upon those claiming under the administrators' title, to discover the nature and character of their title, and asking the court to decree it to be delivered up to be canceled, and the possession restored. The defendant, in his answer, set forth the origin of his title, which was under the order of a tribunal without jurisdiction, and by his answer, in the nature of a cross-bill, he prayed that in the event the court should decree his title to be void, he should have his purchase money and interest, his taxes, costs, and trouble of paying them, etc., refunded to him, and to decree them to be a lien on the land till paid by the complainant. If there be any foundation in principle or precedent, for the doctrine now contended for by the complainant's counsel, why did not the court, in that case, say to the 488]   heir at law, *you have come into a court of equity, and must, therefore, do equity; this land has been sold, and the proceeds applied to the payment of debts, which were a charge upon this land in your hands. It is true that the court had no authority to order the sale in question, but this court are satisfied that another tribunal might have made the order, and that the land might have been correctly sold; therefore, it is decreed that your bill be dismissed. The defendant did not ask this of the court, he only asked to have his money refunded; but even this the court refused, because no court of chancery could undertake to decree the heir at law to refund money paid to a third person, upon a mistaken consideration. The right of the purchaser to recover his purchase money, the court say, can not be litigated with the heir, either at law or in equity.

Lieby v. Parks and others.

In the case of Wills v. Cowper and Parker, 2 Ohio, 129, the same doctrine is laid down by this court, where they refused to enforce the specific performance of a contract, though fair and equitable, because made by an administrator without proper authority, and, therefore, inoperative and void.

In such cases, the fairness of the sale—the payment of the purchase money—the hardship of the case upon the purchaser, and the illiberality of the heir who seeks to recover his estate, are matters which can, by no safe and settled rule of equity, enter into the consideration of the case. It is a question of authority or power in the vendor to do the act in controversy; and, although the want of power in the vendor may bring hardship on the purchaser, it must be recollected that the heir at law was no party to the transaction, and none of its consequences are justly chargeable to him. 3 Ohio, 332.

If the orders of court are of any avail, it must be at law, and not in a court of equity. If invalid at law, they are the same in equity.

The second ground talked of for the interposition of the chancellor is, that because there was a necessity to sell, and a proper authority might have been obtained for that purpose by the administrators, the court ought to sustain the sales without any order. It is even contended that the existence of *the law itself, [489 without any order, would furnish a substantial ground upon which to sustain the sale. Such, however, has never been held to be sound law by this court.

The statute has always required something to be done by the court of common pleas, and much has been confided to their discretion; and to dispense with their duties, in such cases as the present, would lead to endless confusion and mischief. It is not difficult to see why it is argued that the sale would be valid, without an order; and why the statute should be considered merely directory to the court and administrators; and why, in the event of injury to the heir at law, he should be turned over to the administrator and his security.

If the order was a valid power, and so defectively executed that the purchaser should, in order to protect his title, be compelled to go into a court of equity, he would have not only to show a valid authority, but that such authority had been fairly performed. If, instead of demurring, the defendants had answered and denied that the sale was in accordance with the requisitions of the statute

447

of 1810, under which *alone* the title could be made out, would not the complainant have been compelled to show that the sale was consistent with all the material requisites of the statute? Enough is disclosed upon the face of Parks' title, under whom he claims, to authorize a court of equity to lay hold of the case, upon the application of the heirs of Ludlow, and declare the sale a fraud. The circumstances, then, made manifest upon the face of their own title, furnish a key by which it is perceived why this ground of defense is assumed for the complainant.

If the fact that there was a necessity to sell, and that there was a law which would, under certain circumstances, and upon certain conditions, have authorized a sale, be held sufficient ground for the interference of a court of equity, we are at a loss to know upon what principle it is to be supported. If such be a tenable proposition, then there is no necessity for an administrator, order, or deed, in the transfer of an intestate's estate, when he dies indebted. Whoever is most convenient, and has the means, may step in, pay off the debt, take possession of the estate, and enjoy 490] it unmolested. *If the rightful owner assert his title at law, and recover, all that would be necessary to enjoin the judgment, would be to file a bill, show the fact that the estate was in debt, and that there was a law authorizing a sale to discharge the debts, and that those debts had been paid by the person in possession. No inquiry could be instituted whether the sale was fair or agreeable to the conditions of the statute. Such is the legitimate extent of the proposition maintained by the complainant's counsel, when he talks about the insolvency of Ludlow, the fairness of the sale, and the benefit resulting to the heirs at law.

The whole predicate of such a proposition is at war with the title as really derived to the complainant. His title has failed upon its real merits, for the want of a power in the administrators. That want of power can not be supplied by a court of equity. Nor can the want of such a power be evaded by an attempt to show a state of facts, which, if true, could not be consistent with the title as already claimed by complainant.

The third and last ground of relief set forth in the bill is predicated upon the compromise between Parks and the defendant, Garrard. A copy of that agreement is referred to and made a part of the bill, and the matter of complaint is that by it a fraud is practiced upon the covenants of Parks to George Lieby. Upon

Lieby *v.* Parks and others.

this subject we have nothng more to say than was said by us before. We then gave our views of its real consequences to Lieby. We waited for the argument of his counsel to throw some light upon the subject, and show how Lieby was injured. He was no party to the contract, nor was his name introduced into it with any other view or intention than to fix the real amount which the defendant Garrard should pay to Parks. Parks had conveyed to Lieby a part of the land in dispute in the action of ejectment; by that judgment Parks had not only lost his own, but his liability to refund to Lieby was fixed. The question with him was, what shall be done? This judgment not only sweeps him of house and home, and turns him penniless upon the world, but it leaves him without the power to refund to others, who had purchased of him. In this situation he applied to the defendant, Garrard, for a compromise. *One was entered into, by which Parks is left with [491 an estate worth twenty thousand dollars, by which he is enabled to answer all demands against him. By this compromise he does not attempt to prejudice the rights of Lieby, who was his co-defendant. He does not attempt to surrender up any portion claimed by Lieby. He does not deprive him of any legal or equitable defense, or throw the slightest impediment in his way. Parks seeks to purchase his own quiet and independence. Without the stipulation on the part of Garrard to indemnify him, he would, upon the execution of the judgment in ejectment, be harassed upon his covenants to Lieby. The amount of these covenants are, therefore, assumed by Garrard with a reference to Parks only.

But this is a contract to which Lieby is a stranger, both in contract and in interest. He is no party to it. It was made without reference to him, except as matter of description in fixing and identifying Garrard's liability. Lieby is made neither better nor worse, except as Parks' responsibility is made more sure by increasing his available means. And this, we apprehend, is strange matter for which to infer fraud upon Lieby.

Opinion of the court, by Judge COLLET:

Does the complainant, in his bill, state such facts as will authorize this court to enjoin the proceedings in the action at law? The complainant, by his bill, relies for relief on three grounds:

1. That there is a plat, in the clerk's office of Hamilton county, which shows that the land in dispute was situate beyond the

bounds of the town of Cincinnati, when the order to sell lands, of May term, 1804, was made by the court of common pleas; and, consequently, as it was unimproved, was embraced by that order; whereas, on the trial at law, the plat exhibited in evidence was erroneous, and showed that the premises in controversy were situate within the town of Cincinnati at the time the said order to sell was made, and, consequently, not embraced by that order.

2. That the sale of the land was necessary for the payment of 492] the debts due from the estate of Ludlow; that *it was fairly made by the administrators for its full value, and the purchase money all appropriated to the payment of the debts due from the estate of Ludlow.

3. That the agreement of Garrard and Parks, referred to by the bill, is a fraud on the covenants of Parks, contained in his deeds to the complainant for the premises, and an equitable bar to the recovery of the premises by the heirs of Ludlow.

As to the first ground for relief. The title of the complainant depends on the orders of the court of common pleas directing the administrators of Ludlow to sell the property, and on the compliance, on the part of the administrators, with the orders and the law, in effecting the sale to Parks. Of the authority to vest this power to sell, and of the compliance with the law and orders, in perfecting this sale, the court of law had jurisdiction to inquire; and further, the court of law did make this investigation. Whether the court of law erred in opinion is not a proper subject of inquiry for a court of equity, nor whether a fair and impartial trial was had at law, unless the complainant shows clearly to the court that he had a good defense at law and was prevented from availing himself of it, by fraud or pure accident, without any fault or negligence of himself or his agents. 2 Pet. Cond. 518.

That an erroneous plat was used on the trial, showing that the premises were situate within the town of Cincinnati, at the time the order to sell land, of May term, 1804, was made; that the premises were then unimproved; that there is a correct plat in the clerk's office of Hamilton county, showing that the premises were not within the town of Cincinnati at that time, if its production would probably have altered the verdict, is not a sufficient showing to authorize this court to grant relief.

If the erroneous plat was fraudulently made, and imposed on the court at the trial, by the heirs of Ludlow, or the complainant

was prevented, by fraud, from using the correct plat, the bill should state how the fraud was practiced, what fraudulent acts were done or words spoken. If he was prevented by accident, the bill should state how: as that the complainant or his agents did not know of the plat in the *clerk's office of Hamilton [493 county, in Cincinnati; or if they did know that there was such a plat, that they did not know where it was until after the time within which they could have moved the court of law to grant a new trial.

Should this court enjoin this judgment, and order a new trial at law, because a fair trial had not been had, it must order a new trial in every case where the defendant may, in general terms, allege fraud in the plaintiff in obtaining the verdict against him, and that there existed evidence which would probably change the verdict. From their feelings, defendants would do this with a pure conscience in most of the cases where verdicts are against them. Hence courts of chancery, before they order a cause reheard at law, require that the complainant should show that he used due diligence in preparing and conducting his defense at law, but that he was prevented from then making it, by circumstances beyond his control. 3 Johns. Ch. 350.

The second ground for relief is, that the sale of this land was necessary for the payment of the debts due from the estate; that it was fairly made for full value, and that the proceeds of the sale were appropriated to the payment of the debts due from the estate.

As to this, the title to or lien on the land, in behalf of the complainant, if it exists, is strictly legal, and must arise from the authority of the court of common pleas to issue the orders referred to by the bills of the complainant, and from the compliance of the administrators with those orders, and the law, in making the sale of the premises to Parks. 2 Ohio, 393. Those inquiries have been made by the court of law; it has been there decided that the sale was without authority; and that the complainant's title was therefore defective. The complainant, if he had purchased directly from the administrator, could not have a lien on the land in controversy superior to that of any other person who had furnished the administrators with money to be appropriated to the payment of the debts due from the estate; and which they had so appropriated. This would not create a lien on the lands inherited

by the heirs from the intestate.　1 Ohio, 522; 3 Ohio, 332.　If the
494]　complainant has a right to recover *any part of the purchase money paid by Parks to the administrators of Ludlow, the administrators must, undoubtedly, be parties to the suit.　1 Ohio, 522.　That the complainant has made valuable and expensive improvements on the premises, does not authorize this court to enjoin the proceedings in the ejectment for the recovery of the premises. The right of a defendant in ejectment to recover payment for the improvements he has made on the premises recovered of him, is given by the occupying claimant laws; the rules and mode by which the amount shall be ascertained, are prescribed by these laws, and the proceedings are all required to be in the court of law in which the ejectment is tried.　The law does not give to this court jurisdiction in such cases.　The remedy at law is as plain and as adequate as the legislature chose to make it.

3. That the agreement of Garrard and Parks is a fraud on the covenants in the complainant's deeds from Parks, and entitles the complainant to relief against the judgment at law.　The agreement of Garrard and Parks can not injuriously affect the rights of the complainant.　It does not place him in a worse situation in respect to his rights of recovery of the purchase money and interest of Parks, since the complainant did not assent to it.　If the covenants contained in the agreement of Garrard and Parks, to indemnify Parks against his covenants of warranty with the complainant, can operate as an estoppel to prevent Garrard, or the other heirs of Ludlow, from setting up their legal title to the premises, it would be by giving to these covenants of Garrard an effect not probably intended by Garrard and Parks at the time they made them.　This court will not sustain a bill to extend the operation of an agreement beyond the intention of the parties when they entered into it.　It will, in many cases, sustain a bill to prevent its being so extended.　Estoppels are not favored by courts of law, and less by court of chancery.　Whether this article can have this operation in a court of law or not, this court will not determine, nor will it sustain a bill to give it this effect.

Upon this whole case, this court is clearly of opinion that the complainant's bill does not state such facts as would authorize
495]　*the court on the hearing, if they were all proved, to decree for the complainant.　The bill must, therefore, be dismissed at the complainant's costs.